Steven A. Morelli (SM-4721)
Joshua Beldner (JB-2182)
The Law Office of Steven A. Morelli, P.C.
1461 Franklin Avenue
Garden City, NY 11530
(516) 393-9151

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SALLY MAYA,

              Plaintiff

       -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
and HOWARD KWAIT, in his Official and Individual
Capacity,

              Defendants.
-----------------------------------------------------------------X

**VERIFIED
COMPLAINT**

*Jury Trial Demanded*

     Plaintiff SALLY MAYA, by and through her attorneys, THE LAW OFFICE OF

STEVEN A. MORELLI, P.C., respectfully alleges, upon knowledge as to herself and her

own actions, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     A graduate of Columbia University, Plaintiff Sally Maya has dedicated her entire

professional life to helping children learn. Indeed, over the course of her

employment at Defendant New York City Department of Education ("DOE"),

Ms. Maya proved herself as a hard-working, capable and talented educator and

administrator. However, once Ms. Maya decided to start a family, and have

children of her own, she began to suffer relentless harassment, discrimination, and retaliation by her direct supervisor – Mr. Howard Kwait, Principal of John Bowne High School. Following the birth of her children, Ms. Maya should have been enjoying the happiness of early motherhood. Instead, Mr. Kwait made certain that Plaintiff was subjected to a work environment permeated with hostility, ridicule, and torment.

2.      Plaintiff began working for the DOE in 2001, as a high school English teacher. In March 2008, Ms. Maya was hired to work as an Assistant Principal for English at John Bowne High School, in Queens, NY. Plaintiff excelled at her position, and for the first eighteen months on the job enjoyed a positive and productive working relationship with Principal Howard Kwait. Indeed, Mr. Kwait often praised her for her talent, work ethic, skill, and dedication. However, almost immediately after Ms. Maya informed Mr. Kwait that she was pregnant in October 2009, her environment turned toxic. Mr. Kwait, among other things: (1) regularly made discriminatory remarks and comments regarding Ms. Maya's pregnancy; (2) frequently yelled and screamed at Ms. Maya in an aggressive and angry manner; (3) continuously threatened Ms. Maya regarding her employment status; (4) told Ms. Maya, while she was nine months pregnant, to "get the fuck out of [his] building," (4) expressed clear displeasure over Ms. Maya taking child-care leave; (5) issued Ms. Maya unwarranted disciplinary write-ups and letters; (6) directed teachers in Ms. Maya's department not to speak to her; (7) fabricated an incident to discipline Ms. Maya by using his lover, a school aide in the building, as a

2

"witness" to an event that never occurred; (8) converted Ms. Maya's office into a teacher workspace following her return from maternity leave; (9) over-loaded Ms. Maya with duties and responsibilities that were given to no other Assistant Principal in the building; and (10) humiliated Ms. Maya at cabinet meetings.

3.  Additionally, Mr. Kwait made clear that because Ms. Maya had provided information to officials from the Office of the Special Commissioner of Investigation ("SCI") about him, that she would not receive tenure. In providing such information, Ms. Maya was acting as a private citizen, speaking out on matters of public concern – the artificial inflation of student grades. Mr. Kwait was made aware of Plaintiff's complaints to the investigators, and in June 2013 told her, "You will never receive tenure as long as you continue to speak out against me."

4.  By the end of the 2012-2013 school year, after yet another year of threats, coercion, intimidation and hostility, Plaintiff felt she had no choice but to resign. In August 2013, Ms. Maya reluctantly tendered her resignation. Just three days later, however, unbeknownst to Plaintiff, Mr. Kwait took it upon himself to convert her resignation to a "termination" in the DOE database system. Ms. Maya learned of this unwarranted and malicious conversion when she began applying to DOE jobs in the spring of 2014, and was told by a DOE administrator that her application was flagged as a result of the termination designation initiated by Mr.

3

Kwait. As a result of Mr. Kwait's malevolent actions, Ms. Maya has been unable to find employment at the DOE.

5.      As more fully set forth below, in discriminating against Plaintiff on the basis of her gender, and subjecting Plaintiff to a hostile work environment, Defendants have violated her right under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983. Further, in retaliating against Plaintiff for speaking out as a citizen on a matter of public concern, Defendants violated Plaintiff's First Amendment Right to Free Speech, pursuant to 42 U.S.C. § 1983.

### JURISDICTION AND VENUE

6.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

7.      Venue is proper in this case pursuant to 28 U.S.C. § 1391 because the events which give rise to Plaintiff's claims took place in Queens County, New York, which is located in the Eastern District of New York.

### PARTIES

8.      Plaintiff SALLY MAYA is a 38-year-old female individual, who is a resident and domiciliary of Nassau County, NY. At all times relevant to this complaint,

4

Plaintiff was an "employee" of Defendant New York City Department of Education.

9.     Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is a municipal corporation incorporated under the laws of the State of New York, which is in charge of all public schools in the City of New York. Its headquarters are located at 52 Chambers Street, New York, NY 10007. At all times relevant to this complaint, Defendant DOE was Plaintiff's employer.

10.    Defendant HOWARD KWAIT at all times hereinafter mentioned, was and still is the Principal of John Bowne High School.  At all times relevant to this complaint, Mr. Kwait was Plaintiff's direct supervisor.

## FACTUAL ALLEGATIONS

### *Background*

11.    Plaintiff Sally Maya is a well-respected teacher and administrator, who has dedicated her entire professional life to education. Ms. Maya graduated with a Master's Degree from Columbia University, and began her career at Defendant New York City Department of Education ("DOE") in 2001. Specifically, Ms. Maya was hired to work at Forest Hills High School ("Forest Hills"), as an English teacher.

5

12.  Ms. Maya worked at Forest Hills continuously from 2001 to March 2008. While at Forest Hills, in addition to performing her duties as an English teacher, Ms. Maya held several leadership positions, serving as: (1) "Lead Teacher" at the Academy of Public Service; (2) Curriculum Committee Leader; and (3) Dean of Discipline.

13.  While at Forest Hills, Ms. Maya received exclusively positive performance evaluations, and was never subject to discipline of any kind.

14.  In March 2008, Ms. Maya began working at John Bowne ("John Bowne") High School, in Queens, NY, as an Assistant Principal for English. In particular, Ms. Maya was hired by Defendant Howard Kwait, who was, and still is, Principal of John Bowne.

15.  As an Assistant Principal, Ms. Maya was responsible for supervising more than 20 teachers, and three librarians. In addition, Ms. Maya successfully planned activities to ensure proper instruction of curriculum, organized and directed committees, and regularly met with and counseled staff and students.

16.  Over the course of her employment at John Bowne, Ms. Maya proved herself as a hard-working, professional, and selfless administrator who was dedicated to the student body at the school.

6

17.   From March 2008 to October 2009, Plaintiff worked at John Bowne without incident. Ms. Maya was regularly praised by Mr. Kwait for her work ethic and competency, and she genuinely enjoyed coming to work each day. Plaintiff and Mr. Kwait had a professional, productive, and supportive working relationship.

18.   That positive relationship deteriorated rapidly, however, once Ms. Maya informed Mr. Kwait that she was pregnant with her first child.

### *Discrimination*

19.   In October 2009, Ms. Maya approached Mr. Kwait and told him that she was pregnant. Specifically, Plaintiff told Mr. Kwait that she was due in February 2010. Mr. Kwait immediately responded by stating "I guess this means I will have less of you." He then told Plaintiff that he had lost a child with his ex-wife, and discussed how much he wanted to have a child with his girlfriend at the time. As he spoke and discussed Plaintiff's upcoming child and pregnancy, Mr. Kwait began crying.

20.   Although Ms. Maya was surprised, and felt a little uncomfortable by Mr. Kwait's reaction to her pregnancy, she continued to work diligently at her job, as she always did. However, after informing him of the pregnancy, Ms. Maya quickly noticed that Mr. Kwait's attitude towards her changed drastically.

21.     In December 2009, for example, Plaintiff approached Mr. Kwait to discuss a teacher who had acted disrespectfully towards her during a staff meeting. Mr. Kwait told Ms. Maya that she appeared to be "too emotional lately," and then further stated, "maybe it's the pregnancy hormones."

22.     While Plaintiff was taken aback by these comments, she nevertheless requested that Mr. Kwait assist her in dealing with the disrespectful teacher. Mr. Kwait, however, refused, and stated that he "did not want to get involved." Plaintiff was shocked, as this was the first time he had ever refused to support her and provide assistance regarding a teacher.

23.     In March 13, 2010, Plaintiff's baby daughter was born. The following day, while Ms. Maya was still in the hospital, Mr. Kwait showed up and met with her while she was still in the hospital. Mr. Kwait spoke at length about how much he wanted to be a father, and further discussed the recent break-up he went through with his fiancée. Plaintiff, who was still in the hospital bed recovering from the delivery procedure, felt uncomfortable following this bizarre encounter and conversation.

24.     After taking maternity leave, Plaintiff returned to work on June 7, 2010. Less than three weeks later, Ms. Maya was summoned to a "secret meeting," called by Mr. Kwait. The purpose of the meeting was to review the transcripts of students who were deficient credits and were unable to graduate that school year. Mr. Kwait

8

wrote "60%" on the board, and the number of students that were needed to "find credits for." Plaintiff was given a directive to override teachers' grades, from 55 to 65.

25.    One particular student needed an increased English grade to pass. Ms. Maya, however, told Mr. Kwait that the student had not attended any English classes, and that she would not artificially inflate the teacher's grade so that the student could graduate.

26.    Mr. Kwait immediately became defiant, and intimidating. He loudly said, "Are you telling me, *Probationary* Assistant Principal Ms. Maya, that you will not do your job? Are you telling me that as a probationary Assistant Principal, you will not follow through with a Principal's directive!?" Mr. Kwait then walked to office, which was adjacent to the conference room in which the meeting was held, and slammed the door.

27.    Mr. Kwait then successfully enlisted the student's teacher to agree to change the student's grade from 55 to 65. When he returned to the room, he slammed down the student's transcript on the table and loudly stated "And that's how it's done!" Plaintiff was startled by Mr. Kwait's unwarranted and angry outburst.

*2010-2011 School Year*

28.　In September 2010, Ms. Maya was selected to provide professional development to the school's staff on common core learning standards.

29.　In October 2010, Mr. Kwait informed Ms. Maya that Ms. Judith Rycar would be returning to the building. Ms. Rycar was a teacher who he had brought up on § 3020-a disciplinary charges. Mr. Kwait told Plaintiff that they needed to "get her."

30.　Despite the birth of her child, in the Fall 2010, Plaintiff continued to exhibit the same dedication and hard-work she was praised for prior to taking her maternity leave. However, Mr. Kwait told Ms. Maya that he needed her to get back to the same "focus" that she had "when [he] first hired [her]." Of course, when he first hired Ms. Maya, she was not pregnant and had no children.

31.　In December 2010, Plaintiff informed Mr. Kwait that she was pregnant with her second child. Mr. Kwait responded by stating "Again? That was quick." He then stated "we have a lot of work to do."

32.　A few weeks later, Ms. Maya spoke to Mr. Kwait in his office, and told him that she needed assistance from another Assistant Principal in the planning and preparation of the new English program format that was being implemented for the January 2011 Regents examination. Mr. Kwait told Plaintiff that he "expected

more" from her than the other administrators at the building. Ms. Maya reminded him that she was pregnant, had an infant at home, and was stressed out as a result of all of the extra work he gave her. Mr. Kwait responded by simply stating "I am not getting from you what I used to get," and "I miss the old Sally."

33. Shortly thereafter, in December 2010, Ms. Maya walked by Mr. Kwait outside of the dean's office. Mr. Kwait told Plaintiff "you are wobbling. Maybe you should tell people that you are pregnant so they don't think you are just getting fat." Plaintiff was once again uncomfortable as a result of Mr. Kwait's unsettling remarks regarding her pregnancy.

34. During the Spring of 2011, Mr. Kwait continued to overload Ms. Maya with far more work than that given to the other Assistant Principals at the school. Notably, during Plaintiff's time working under Mr. Kwait, no other Assistant Principals at the school had become pregnant.

35. Mr. Kwait also required Ms. Maya to spend countless hours preparing for the 3020-a disciplinary hearing against female teacher Judith Rycar. Mr. Kwait attempted to "coach" Ms. Maya as to how be an effective witness against Ms. Rycar, and specifically stated "I have to teach you how to lie." Mr. Kwait later told Ms. Maya "I just want her out of my building." Notably, at the start of the school year, he told Plaintiff that he needed her help to "get" Ms. Rycar. These

statements were indicative of Mr. Kwait's vindictive nature, and evidenced his practice of targeting specific employees.

36.   In June 2011, Plaintiff learned that Mr. Kwait had mistreated another pregnant female teacher in the building. Indeed, Ms. Maya learned that Ms. Holly Verner, who was nine months pregnant at the time, had left a meeting with Mr. Kwait in tears after he "intimidated" her and "made her uncomfortable."

### *Mr. Kwait Verbally Abuses Plaintiff While She is Nine Months Pregnant*

37.   A few weeks later, Plaintiff spoke to Mr. Kwait about his decision to discontinue certain Regents classes for the following school year. When Ms. Maya began to point out some of the virtues of the classes, Mr. Kwait began screaming, and verbally berating her. Mr. Kwait yelled "You work for me! Not the other way around! I will remind you that you are the Assistant to the Principal, and a *Probationary* Assistant Principal!" Ms. Maya was nine months pregnant at the time, and had been experiencing mild contractions that day.

38.   Plaintiff calmly asked Mr. Kwait not to speak to her in such a disrespectful, aggressive, and hostile tone. Mr. Kwait responded by telling her "If you don't like it, *then get the fuck out of my building!*"  Plaintiff was shocked, and visibly shaken as she left his office.

39.     About a week later, Ms. Maya met with Mr. Kwait to go over her end-of-year performance evaluation. While Mr. Kwait complimented Plaintiff as to several aspects of her job performance, he again stated "I'm not getting what I used to get from you." Plaintiff reminded him that, with her new family, she tried to have work/life balance. In response, Mr. Kwait curtly stated "I have no balance in my life," clearly intimating that Plaintiff should focus less on her own family life.

40.     In July 2011, after the birth of her son, Ms. Maya informed Mr. Kwait that she would be taking a 12 week child-care leave at the start of the school year. Mr. Kwait immediately expressed his displeasure, and angrily stated "Your maternity leave begins from the day your child is born. I expect you back in August."

41.     Although Plaintiff was concerned that taking the child-care leave in the fall would upset Mr. Kwait, she decided to do so after consulting with Mr. Ian Kamen, Assistant Principal of Organization. In August 2011, Ms. Maya informed Mr. Kwait that her child-care leave would begin on September 12, 2011.

42.     On September 7, 2011, just days before her scheduled leave, Plaintiff received a phone call from Mr. Kwait while she was on her way to pick her daughter up from daycare. Mr. Kwait was noticeably livid, and yelled at Ms. Maya over an issue relating to English Department lesson plans.

43.   Over the phone, Plaintiff calmly explained that she was unable to make copies of the plans because none of the photocopy machines in the English Department were working. Mr. Kwait then became extremely hostile and aggressive, and screamed "That is not my problem! That is your problem!" Mr. Kwait continued yelling "I am not playing these games with you. If you do not have these plans for the teachers by the end of the week, you will receive a disciplinary letter for insubordination. You are a probationary Assistant Principal. When I tell you to do something, you do it!" Ms. Maya was once again visibly shaken as a result of the blatant threats, coercion, and intimidation to which she was being subject.

44.   Plaintiff made sure that the teachers received the copies of the lesson plans by the end of that week. Prior to taking her scheduled child-care leave on September 12, Plaintiff was fearful of even seeing Mr. Kwait at the school, and avoided him as much as possible.

45.   Following Plaintiff's departure for child-care leave, Mr. Kwait sent out an email to the English Department stating that no teacher was permitted to contact Ms. Maya about any instructional or curriculum issues. Mr. Kwait was clearly attempting to isolate Ms. Maya from the remainder of the staff.

46.   Indeed, in October 2011, one of the English teachers at the school called Ms. Maya while she was home and asked about her and the baby. The teacher told

14

Plaintiff that Mr. Kwait specifically told all teachers that he did not want "anyone speaking to [Ms. Maya]."

### *Harassment Upon Plaintiff's Return From Leave*

47.   On or about November 14, 2011, Ms. Maya returned from maternity leave. Upon her return, she immediately discovered that Mr. Kwait had decided to turn part of her office into a teacher workspace. Upon learning of this development, Plaintiff approached Mr. Kwait and told him that she no longer had any privacy in her office. Mr. Kwait responded by stating "I don't see it as a problem."

48.   Ms. Maya then informed Mr. Kwait that she was pumping breast milk for her baby, and that she would like a private place to pump milk. Ms. Maya suggested that she be given a place similar to the United Federation of Teachers ("UFT") office, which has an area to comfortably pump milk. Mr. Kwait immediately rejected her request, stating "You are not UFT."

49.   Ms. Maya also brought up his tirade from September 9. Mr. Kwait simply said "I am sorry that you feel the need to bring that up."

50.   Two days later, on November 16, 2011, Mr. Kwait stopped by Ms. Maya's office and told her that he wanted to have meetings with her on a regular basis. These types of meetings had never occurred before. Additionally, upon information and

15

belief, Mr. Kwait did not schedule these kinds of meetings with the other Assistant Principals at the school.

51.    On December 2, 2011, just two weeks after returning from maternity leave, Plaintiff attends the first of her "regular" meetings with Mr. Kwait. Almost immediately at the outset of the meeting, Ms. Maya recognized that Mr. Kwait's tone is hostile and accusatory. Mr. Kwait told Plaintiff that he knows that she was "having issues" with members of the English Department. Ms. Maya was confused, and truthfully responded by stating that she was unaware of any problems with teachers in the Department. Mr. Kwait then accused Ms. Maya of arriving to school late.

52.    Three days later, on December 5, 2011, Mr. Kwait issued Plaintiff a letter outlining their meeting. The letter is characterized by Mr. Kwait as being "supervisory support." However, the contents of the letter was nothing more than criticism of Ms. Maya's performance in the three weeks she returned from child-care leave. When Plaintiff approached Mr. Kwait about the letter, he told her "You are just lucky that you did not receive three letters for file and that I labeled it as 'support.'" Ms. Maya was shocked, as she had done nothing since her return that would warrant such unfair criticism and scrutiny.

53.    Later in December 2011, Ms. Maya was visited by her Union Representative, Christine Martin. Ms. Martin told Plaintiff that Mr. Kwait told her that Plaintiff

16

had problems "building a team," and that he was not happy that Plaintiff had brought up his September 9, 2011 outburst in which he verbally abused Ms. Maya over the phone.

54.     In December 2011, Plaintiff asked Mr. Kwait if she could work "per session" credit recovery, in which she would have received supplemental income. Mr. Kwait denied her request, and stated that those per session shifts were given to Assistant Principals who were hired before her, and that it was based on seniority at the school. Notably, two of the Assistant Principals hired for the per session shifts were hired *after* Ms. Maya began working at the school in March 2008.

55.     In January 2012, Ms. Maya received a call from Mr. Kwait's former fiancée, Namita Dwarka. Ms. Dwarka was an Assistant Principal at John Bowne while Mr. Kwait was Principal, and had thereafter obtain a Principal position elsewhere. Ms. Dwarka told Plaintiff that Mr. Kwait told her "I want Sally out of my building." Ms. Maya was concerned, as she had heard Mr. Kwait say the same thing about Ms. Judith Rycar, and observed him bring § 3020-a disciplinary charges against her.

56.     On January 31, 2012, as Ms. Maya was walking into the building at 7:00AM, Mr. Kwait began screaming at her in a menacing and aggressive manner. Mr. Kwait told Ms. Maya that other Assistant Principals were at the school until 9:00PM the night before to ensure the department schedule was complete, while "you were at

17

home." Plaintiff told him that she has two small children to care for at home. Upon hearing this, Mr. Kwait grew even more agitated and upset, stating "I am sick and tired of doing your job for you . . .You do not seem to understand that when I tell you to do something you drop everything and do it!" Several other staff members and students witnessed Mr. Kwait's tirade. Plaintiff was once again humiliated, and visibly shaken as she went to her office.

57.   On the following day, February 1, 2012, Plaintiff received a summons for a disciplinary conference. The conference was scheduled for February 7, 2012. This was the first disciplinary meeting of Ms. Maya's twelve year career at the DOE.

58.   At the conference, Mr. Kwait told Plaintiff that Ms. Yvette Reyes had witnessed Plaintiff telling a female student "my son would not date stupid girls." Ms. Maya never made any such statement. Notably, Mr. Kwait told Plaintiff that Ms. Reyes had agreed to appear at the disciplinary conference, but refused to sign a written statement as to what she allegedly observed. Plaintiff was confused, as the entire set of allegations were completely fabricated, and it was befuddling to Ms. Maya that a school aide would ever appear at a disciplinary conference between a Principal and an Assistant Principal. Additionally, it appeared as if Mr. Kwait was using Plaintiff's own child as a means to discipline her for a statement she never uttered.

18

59.     Following the meeting, Plaintiff's union representative, Christine Martin, told her
        that she needed to leave the school. Specifically, Ms. Martin told Plaintiff that she
        should leave because "he will continue to torture you." Upon information and
        belief, Ms. Martin made this statement with prior knowledge of several lawsuits
        that had been brought against Mr. Kwait in the past. Indeed, in 2008, another
        female Assistant Principal at John Bowne filed a federal lawsuit against Mr.
        Kwait and the DOE. Like Ms. Maya, that Assistant Principal asserted that
        Defendants harassed and discriminated against her after she became pregnant.

60.     On February 14, 2012, Plaintiff received a letter from Mr. Kwait outlining the
        disciplinary conference. Thereafter, Ms. Maya approached Mr. Kwait to discuss
        the contents of the letter. Mr. Kwait stated "you should be thanking me that the
        letter was not attached to your discontinuance and that I am continuing your
        employment here at Bowne." Clearly, Mr. Kwait had no grounds to terminate
        Plaintiff, but nevertheless threatened her as a means to further intimidate her and
        create a hostile environment. Nevertheless, fearful of her job, Ms. Maya signed
        the disciplinary letter.

61.     Interestingly, on or about March 6, 2012, approximately one month after Mr.
        Kwait fabricated a story against Plaintiff by using Ms. Reyes as a "witness" to a
        statement that was never made, Ms. Maya learned that Mr. Kwait and Ms. Reyes
        were having a sexual affair. In fact, Mr. Kwait and Ms. Reyes had traveled to
        Greece together during the summer of 2011.

19

62.     A few weeks later, following Spring Break, an inappropriate picture of Mr. Kwait and Ms. Reyes shopping together at Victoria's Secret begins to circulate around the school amongst students and staff.

63.     In May 2012, investigators from the City's Office of the Special Commissioner of Investigation ("SCI") began interviewing members of the administrative staff regarding Mr. Kwait.

64.     In June 2012, Plaintiff met with Mr. Kwait to discuss her year-end evaluation. At this meeting, Mr. Kwait told Plaintiff, "it has come to my attention by several people in the building that you are speaking out against me." Plaintiff was shocked, as she had not even met with the investigators.

65.     Nevertheless, Mr. Kwait continued, "I do not think you understand the role of an Assistant Principal. The role of an Assistant Principal is to insulate him. . .Once again Ms. Maya, I want to remind you of your probationary status." Mr. Kwait's thinly veiled threat was not lost on Plaintiff. He also stated that "as quickly as letters go into [personnel] files, they can be easily be removed." Mr. Kwait ended the conversation by telling Ms. Maya that she should take the summer to "reflect how you can prove yourself to me again."

66.     In July 2012, Plaintiff felt compelled to affirmatively contact SCI investigators regarding Mr. Kwait. Ms. Maya told the investigators that she had seen the photograph of Mr. Kwait and Ms. Reyes. She also told them that Mr. Kwait had pressured teachers to pass students who did not attend class and who did not do the requisite work, in order to artificially inflate students' grades. Of course, a higher student passage rate makes Mr. Kwait look like he is performing better as a Principal.

67.     Over the course of the 2012-2013 school year, Mr. Kwait's mistreatment of Plaintiff continued. Specifically, Ms. Maya was again belittled, threatened, intimidated, and over-worked. Indeed, Plaintiff was given responsibilities that no other Assistant Principal was given. For example, Ms. Maya was the only Assistant Principal who was required to meet with: (1) freshmen students; (2) guidance counselors and parents; and (3) seniors who were failing English classes. Plaintiff was informed by members of the guidance department that Mr. Kwait made clear that these responsibilities were to be covered by Ms. Maya, and Ms. Maya only.

68.     In November 2012, Ms. Maya was forced to attend another disciplinary conference. Prior to the conference, Mr. Kwait accused Plaintiff of somehow being "insubordinate" when she spoke to Mr. Dan Atkins, Network Achievement Coach, about "per session" income opportunities.

69.  At the conference, Mr. Kwait began presenting reasons why Ms. Maya should not be given tenure. Mr. Kwait stated that Plaintiff's tenure nomination was a few months away, and the disciplinary letters (which were completely unwarranted and created by Kwait himself) was evidence of Plaintiff's "underperformance." Ms. Maya, feeling ambushed, pointed out that she had received exclusively Satisfactory performance evaluations over her time at the school. Mr. Kwait cut her off and sternly stated "so far."

70.  In February 2013, Plaintiff learned that her probation was extended. Mr. Kwait told Ms. Maya, "you are the most vulnerable member" of the administrative cabinet.

71.  In March 2013, at a cabinet meeting, Mr. Kwait singled Plaintiff out loudly stated in front of her peers that "the English Department is not performing and the Assistant Principal does not know how to answer a simple question." Ms. Maya was, understandably, humiliated.

72.  In May 2013, Plaintiff was informed by a colleague that Mr. Kwait knew the name of every staff member who spoke to investigators. The colleague obtained this information from Mr. Kwait's girlfriend, Ms. Reyes. Ms. Reyes told the colleague that Mr. Kwait "knew" that Ms. Maya had spoken to SCI investigators.

73.     In June 2013, Plaintiff used a sick day. Mr. Kwait issued Ms. Maya a disciplinary write-up for the day missed, and accused of her "stealing company time."

74.     Later that month, Plaintiff met with Mr. Kwait to discuss her annual performance evaluation. At the meeting, Mr. Kwait confirmed what Plaintiff already knew – she was now also being targeted because of her speech to investigators. Mr. Kwait bluntly told Ms. Maya "You have an extraordinary amount of talent. But let me tell you where you stand with me. *You will never receive tenure as long as you continue to speak out against me."* Plaintiff was once again threatened and intimidated by her direct supervisor.

75.     Ms. Maya could no longer endure the constant hostility and harassment by Mr. Kwait. On or about August 23, 2013, Plaintiff resigned from her position as Assistant Principal at John Bowne. Despite her love of education, and the school's students, Ms. Maya could no longer work under such an aggressive, vindictive, and angry Principal. This forced resignation constitutes a constructive discharge.

76.     Mr. Kwait accepted Plaintiff's resignation via email that day, and wished her luck in the future.

77.     However, on August 26, 2013, just days after graciously accepting Ms. Maya's resignation, Mr. Kwait unilaterally changed the designation associated with her

23

employment file from "resignation" to "termination." This alteration was not known by Plaintiff until August 2014.

78.    As a result of the action taken by Mr. Kwait, Ms. Maya's profile within the DOE system is now "flagged," indicating that she was terminated for cause. This, of course, has made it virtually impossible for Plaintiff to obtain a job.

79.    On January 31, 2014, the *New York Daily News* published an article regarding the results of the City's investigation of Mr. Kwait. The article revealed that at least three female staff members told officials within the Special Commissioner of Investigation that Mr. Kwait had acted in a sexually inappropriate manner towards them in the workplace.

80.    The *Daily News* article also noted that Mr. Kwait had improperly allowed Ms. Reyes to pay for trips they took together to Italy, Greece, Turkey, and Croatia. Mr. Kwait was fined as a result.

81.    Finally, the *Daily News* article pointed out that in 2011, Mr. Kwait had five substantiated claims noted in his disciplinary file, including claims that he cursed at employees, and stole food from the school's cafeteria.

## CLAIMS FOR RELIEF

82.    In discriminating against Plaintiff and subjecting her to a hostile work

environment on the basis of her gender, Defendants have violated Plaintiff's constitutional right to Equal Protection, under the 14th Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983. Defendant DOE is liable for its employees' deprivation of Plaintiff's rights because such acts were taken in accordance with the Defendant's custom or practice of discriminating and/or selectively treating individuals; these practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers; and, the individual policymakers directly participated in and/or tacitly condoned the discrimination/retaliation to which Plaintiff was subjected.

83.   In retaliating against Plaintiff for speaking out as a citizen on matters of public concern Defendants violated Plaintiff's right to Free Speech under the First Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, injunctive relief, liquidated damages, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which she is entitled, including but not limited to:

1.   Awarding reasonable attorneys fees and costs and disbursements of this action;

2.   Granting such other and further relief that to the Court seems just and proper.

Dated: Garden City, New York  
       November 4, 2014

THE LAW OFFICE OF  
STEVEN A. MORELLI, P.C.  
*Attorneys for Plaintiff*  
1461 Franklin Avenue  
Garden City, New York 11530  
(516) 393-9151

Steven A. Morelli